# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

PATRICK L. WILSON,

     *Plaintiff*,

*v.*                  CASE NO. 10-CV-13828

COMMISSIONER OF         DISTRICT JUDGE AVERN COHN
SOCIAL SECURITY,        MAGISTRATE JUDGE CHARLES E. BINDER

     *Defendant*.

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED**, that Plaintiff's Motion for Remand be **DENIED**, that Defendant's Motion for Summary Judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the

---

[1]The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), the recently amended provisions of Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://jnet.ao.dcn/img/assets/5710/dir7-108.pdf. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

Commissioner's decision denying Plaintiff's claim for a period of disability and supplemental security income benefits. This matter is currently before the Court on cross-motions for summary judgment. (Doc. 14 (Pl.'s Mot. for Summ. Judg.), 15 (Pl.'s Mot. to Remand), 16 (Def.'s Mot. for Summ. Judg. & Response), 21 ( Pl.'s Reply).)

Plaintiff was 40 years of age at the time of the most recent administrative hearing. (Transcript, Doc. 9 at 19, 47, 50.) Plaintiff last worked in 2004 and his relevant employment history consisted of general labor work. (Tr. at 54.) Plaintiff filed the instant claims on June 2, 2005, alleging that he became unable to work on April 10, 2005. (Tr. at 47, 50.) The claims were denied at the initial administrative stages. (Tr. at 41.) In denying Plaintiff's claims, the Defendant Commissioner considered "muscle/ligament disorder and fascia" and affective disorders as possible bases of disability. (*Id.*)

On October 13, 2007, Plaintiff appeared before Administrative Law Judge ("ALJ") James N. Gramenos, who considered the case *de novo*. In a decision dated August 18, 2008, the ALJ found that Plaintiff was not disabled. (Tr. at 19-34.) Plaintiff requested a review of this decision on July 16, 2009. (Tr. at 14-15.)

The ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on July 29, 2010, when, after the review of additional exhibits[2] (Tr. at 239-486), the Appeals Council denied Plaintiff's request for review. (Tr.

---

[2]In this circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, since it has been held that the record is closed at the administrative law judge level, those "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). Therefore, since district court review of the administrative record is limited to the ALJ's decision, which is the final decision of the Commissioner, the court can consider only that evidence presented to the ALJ. In other words, Appeals Council evidence may not be considered for the purpose of substantial evidence review.

at 6-9.) On September 24, 2010, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision. (Doc. 1.)

### B.   Standard of Review

In enacting the social security system, Congress created a two-tiered system in which the administrative agency handles claims and the judiciary merely reviews the determination for exceeding statutory authority or for being arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 890, 107 L. Ed. 2d 967 (1990). The administrative process itself is multifaceted in that a state agency makes an initial determination which can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). If relief is not found during this administrative review process, the claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). "It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v.*

*Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'") (citing *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence.")); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers,* 486 F.3d at 247 (quoting S.S.R. 96-7p, 1996 WL 374186, at *4).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, the court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006). *See also Mullen*, 800 F.2d at 545. The scope of the court's review is limited to an examination of the record only. *Bass,* 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers,* 486 F.3d at 241. *See also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (citing *Mullen*, 800 F.2d at 545).

4

When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party"); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed. App'x 521, 526 (6th Cir. 2006).

### C.      Governing Law

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994). *Accord Bartyzel v. Comm'r of Soc. Sec.*, 74 Fed. App'x 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the Disability Insurance Benefits Program ("DIB") of Title II, 42 U.S.C. §§ 401 *et seq.*, and the Supplemental Security Income Program ("SSI") of Title XVI, 42 U.S.C. §§ 1381 *et seq.* Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, Federal Disability Law and Practice § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically
> determinable physical or mental impairment which can be expected to result in death

5

or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If Plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920.  *See also Heston,* 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin,* 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his] impairments and the fact that [he] is precluded from performing [his] past relevant work." *Jones*, 336 F.3d at 474 (cited with approval in *Cruse,* 502 F.3d at 540). If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner. *Combs v. Comm'r*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the

6

national economy that [claimant] could perform given [his] RFC [residual functional capacity] and considering relevant vocational factors." *Rogers,* 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.   Administrative Record

A review of the relevant medical evidence contained in the administrative record and presented to the ALJ indicates that Plaintiff's impairments include physical and mental impairments.

### 1.   Physical Impairments

Plaintiff has complained of back pain since he was in a work accident in 1996. (Tr. at 86.) On January 27, 2005, while working for Kelly Services, Plaintiff strained his lumbar spine. (Tr. at 83.) An MRI taken on February 7, 2005, showed "[d]egenerative changes out of character for this patient's age at L4-L5 and L5-S1," "lateral recess stenosis in both of these levels," and the doctor stated that he "cannot completely exclude traversing nerve root impingement, although I do not see definite nerve root or exiting nerve root impingement at this time, although certainly the region surrounding both of these areas appear very narrowed." (Tr. at 80-81.)

On August 6, 2005, after Plaintiff injured his left knee, a radiological report indicated there was "no fracture or dislocation," "[n]o joint effusion," the "femoral joint is intact" and that "[j]oint space is well maintained." (Tr. at 98.)

On August 30, 2005, Plaintiff was referred to Disability Determination Services ("DDS") for a physical evaluation and it was noted that Plaintiff had a "Don Joy Brace for the left knee" and that, "[w]hen he stands, on observation of the dorsolumbar spine, there is no kyphosis or scoliosis" and "no spasm." (Tr. at  105.) The evaluation also found "a full range of motion of the cervical spine with no spasm" as well as a full range of motion of the shoulders, elbows, wrists and hands.

(*Id.*) The evaluation noted that surgery on Plaintiff's left knee was scheduled for September 26, 2005. (Tr. at 106.)

An x-ray of the lumbar sacral spine taken on August 30, 2005, showed "disc spaces . . . well preserved except for slight narrowing between L5-S1[,] [a]nterior and marginal spur formation, particularly at the level of L5-S1." (Tr. at 111.) Therefore, the impression was "[d]egenerative change, mainly at the level of L5-S1" and "slight distortion of the LS spine with tilt to the right, partly due to positioning." (*Id.*)

On August 9, 2005, Plaintiff was seen by Kevin T. Crawford, D.O., for left knee pain. (Tr. at 145.) After reviewing an MRI of his left knee taken one week prior to the office visit, Dr. Crawford concluded that there was a "suggestion of a medial meniscus tear, medial collateral ligament tear, and what is felt to be a chronic ACL tear." (Tr. at 145.) On October 7, 2005, Dr. Crawford performed an arthroscopy of the left knee with partial lateral meniscotomy, shave of the medial femoral condyle, and anterior cruciate ligament ("ACL") reconstruction. (Tr. at 146-50, 184-85.) On October 20, 2005, Dr. Crawford found "no joint effusion, no redness or warmth,"and stated that Plaintiff "does have a benign appearing wound." (Tr. at 144.) He started Plaintiff on physical therapy.

In late November 2006, X-rays of the sacrum/coccyx showed "[n]o displaced fracture or dislocation," "[m]ild degenerative changes . . . at [the] lumbosacral junction," and "[d]isc narrowing . . . at L5-S1." (Tr. at 230.) Lumbar spine X-rays revealed "[d]egenerative changes in the lumbar spine with disc narrowing at L4-L5 and L5-S1," but "[n]o displaced fracture [was] noted." (Tr. at 233.)

On May 7, 2007, Plaintiff was evaluated by Punitha Vijayakumar, M.D., who is certified in neurology and sleep medicine. Dr. Vijayakumar's impression was: "[i]ntractable headache and

left-sided facial paresthesia, need to rule out demyelination either in the brain or C-spine," so Plaintiff was asked to undergo an MRI. (Tr. at 170-71.) On June 4, 2007, Dr. Vijayakumar noted that Plaintiff was "reporting significant pain all over his body" and was "requesting whether I could give something more stronger than Vicodin," so she prescribed "Zanaflex to begin for a muscle relaxant." (Tr. at 169.)

On May 12, 2007, Plaintiff was referred to Luis E. Torregrosa, M.D., whose impression was that Plaintiff had "[c]hronic pain syndrome" and "[d]egenerative arthritis in both knees." (Tr. at 203.)

On May 19, 2007, an MRI of the brain was taken because of Plaintiff's facial pain and it showed "[n]o evidence of a mass, acute intracranial hemorrhage, or abnormal enhancement." (Tr. at 214.) The MRI report also stated: "Small focal punctate area of high signal within the white matter right frontal lobe. Differential diagnosis would include a demyelinating process, chronic small vessel ischemic changes, Lyme's disease, headaches, or vasculitis." (*Id.*) An MRI of the spine was also taken on May 19, 2007, but it was "somewhat limited due to patient moving[,][h]e would not cooperate and hold still." (Tr. at 216.) The impression was that there was "[n]o evidence of a herniated disc, lateral recess narrowing [or] spinal canal stenosis." (Tr. at 217.) The MRI also showed "[m]ild degenerative joint disease changes most prominent at C5-C6." (*Id.*)

On June 20, 2007, Plaintiff was referred to Jeff S. Pierce, D.O. who recommended testing, physical therapy or an exercise program at home. (Tr. at 198.) Dr. Pierce also noted that he did not feel comfortable "prescribing narcotics or aggressive treatment until the patient seems more committed to the program." (Tr. at 199.)

On July 18, 2007, Dr. Vijayakumar noted that Plaintiff complained of "a constant headache [that] sometimes . . . comes and goes," and so she reviewed the MRI of his brain and concluded that "there is not a significant problem." She prescribed Depakote to help Plaintiff sleep. (Tr. at 168.)

On August 15, 2007, Dr. Vijayakumar noted that Plaintiff was "asking for stronger medication other than Vicodin," but Dr. Vijayakumar indicated that she "advised him that I am not going to give any pain medications." (Tr. at 167.)

On August 21, 2007, Plaintiff's right knee was evaluated by Dr. Crawford who found "significant arthritis of the [right] knee" and who "discussed at length with [Plaintiff] the idea of limited longevity of these knee replacements as well as the risks involved and the pain involved," but Plaintiff was "still anxious to proceed," so Dr. Crawford began "arranging right total knee arthroplasty for him." (Tr. at 187.) Plaintiff underwent a right knee total arthroplasty on September 5, 2007, which was performed by Dr. Crawford. (Tr. at 189-97.)

On September 5, 2007, an x-ray of Plaintiff's right knee showed the "[t]otal right knee arthroplasty with prosthesis appears in good position." (Tr. at 205.)

In September 2007, Dr. Vijayajumar indicated that Plaintiff reported that the prescription drug Depakote was "helping [him] to fall asleep," but that Plaintiff was "complaining of intractable headache" and that, "[s]upposedly, he is complaining of twitching of upper extremities and sleep sometimes." (Tr. at 166.) Although it was noted that Plaintiff was "on multiple different muscle relaxants," Plaintiff "reports that nothing is working for him." (*Id.*) Dr. Vijayakumar's impression was "[c]hronic pain symptom, most likely fibromyalgia," because she did not see "any other etiology." (*Id.*)

## 2. Mental Impairments

On March 29, 1996, Plaintiff was assessed by a DDS examiner for mental status. The examiner reported that when Plaintiff was asked why he does not work, Plaintiff responded, "'I don't do nothin. I get upset if anybody gets in my way. I got a lot of problems. I don't like people.'" (Tr. at 73.) The examiner found that Plaintiff "did not give reality based statements [and] [t]here was a sense of paranoia." (*Id.*) Plaintiff was "hostile and abrasive," and "poorly motivated for change." (*Id.*) Plaintiff "tended to exaggerate his symptomology and displayed no overall insight into his overall situation." (*Id.*)  Plaintiff also reported "that he began drinking alcohol at age nine and he is alcoholic [and] last drank yesterday." (*Id.*) Plaintiff also "stated that he has been [smoking] pot since age ten and he smokes to deal with life." Plaintiff stated that "he smoked this morning prior to the testing." (*Id.*) The "examiner does not believe that this is truly a learning disability." (Tr. at 75.)

An examination conducted on March 11, 1998, similarly noted that Plaintiff "consistently used vulgar and crass phrasing to express himself" and that Plaintiff told the examiner, "'I think you're an asshole. I think you're a fuckin' idiot.'" (Tr. at 76.) Plaintiff also stated, "I love pain medication, but they ran out." (Tr. at 77.) The examiner also noted that although Plaintiff stated that he "'just can't sit down,' he sat throughout this evaluation." (Tr. at 76.) The examiner again stated that Plaintiff's "comments were not grounded well in reality" and that he was "abrasive, confrontational," "not motivated to do anything" and that he "tends to exaggerate his symptomology." (Tr. at 77.) The examiner concluded that there was "no evidence of hallucinations," although Plaintiff was "[d]epressed, anxious and suspicious" and had "tried to commit suicide" several times in the past. (*Id.*) At this evaluation, when asked why he was unable to work, Plaintiff responded, "because of back pain," although the examiner noted that "[o]bjective testing does not indicate any physical considerations." (Tr. at 78.) The examiner noticed that

Plaintiff was wearing cowboy boots, which the examiner found to be "an unusual choice of footwear for someone with disabling back pain." (Tr. at 78.) The examiner also noted that Plaintiff "did not limp," and that although Plaintiff "walked out carrying [a] cane, [he was] not using it for ambulation." (*Id.*) The examiner concluded that Plaintiff "knows exactly what he is doing and he is certainly trying to manipulate the contents of this evaluation to his own benefit." (*Id.*)

On June 16, 2005, an "Initial Biopsychosocial Assessment" was performed and, at this assessment, Plaintiff again stated that he "has difficulty keeping steady employment because of his attitude." (Tr. at 85.) Plaintiff also admitted to current or recent use of ecstasy and marijuana. (Tr. at 87.)

Plaintiff sought treatment with Eastwood Clinics in September 2005 for mental health issues, including suicidal ideation, and it was noted that Plaintiff "admits to the thoughts but not now and has no plan." (Tr. at 116, 115-23.)

A Psychiatric Review Technique conducted for the period between April 10, 2005, and September 20, 2005, diagnosed Plaintiff with Affective Disorders, Personality Disorders, and Substance Abuse Addiction Disorders. (Tr. at 124.) The review found that Plaintiff was mildly limited in activities of daily living and moderately limited in maintaining social functioning and maintaining concentration, persistence and pace. (Tr. at 134.)

A Mental Residual Functional Capacity ("RFC") Assessment conducted on September 20, 2005, concluded that Plaintiff was moderately limited in the ability to understand and remember detailed instructions, carry out detailed instructions, and maintain attention and concentration for extended periods, but that he was otherwise not significantly limited in understanding, memory, or sustained concentration and persistence. (Tr. at 138-39.) The assessment also found that Plaintiff was moderately limited in his ability to interact appropriately with the general public and the

ability to accept instructions and respond appropriately to criticism from supervisors, but was otherwise not significantly limited in the areas of social interaction and adaptation. (Tr. at 139.) The assessment concluded that "[d]espite these limitations, he is able to perform unskilled work." (Tr. at 140.)

On August 30, 2006, Plaintiff was referred to the DDS for a mental status evaluation where it was noted that Plaintiff "reported that he has problems with everything." (Tr. at 99.) Regarding the alleged back and knee injury, Plaintiff "indicated that 200 pounds of steel 'landed' on him in 1997 and he has been in constant pain ever since." (Tr. at 99.) "Regarding the alleged learning disorder, the claimant [stated he] was diagnosed, 'when I was young.'" (*Id.*) As to Plaintiff's employment history, the evaluation stated that Plaintiff "worked for Kelly Services in labor for one to two weeks in 2005 but quit because 'I got hurt again.'" (Tr. at 100.) Before that, he "worked at American Bumper on the line for approximately six months, but quit because [he] 'just quit.'" (*Id.*) Prior to that, he "worked at BFI as a garbage man for one year in 1994 but quit because [he] 'just woke up and said fuck it.'" (*Id.*) Plaintiff reported that although he "smokes one pack of cigarettes a day" and formerly "drank daily two and a half fifths" of alcohol, he "last drank two years ago and currently does not drink." (*Id.*) He also reported "past cannabis dependence issues" and that he "used cocaine daily," but states that he currently does not use either. (*Id.*) The evaluator stated that Plaintiff "appeared to be trying to exaggerate his symptoms." (*Id.*) Plaintiff was diagnosed with "Depressive Disorder NOS," "Poly Substance Abuse Dependence in Full Sustained Remission per the claimant's unreliable report" at Axis I, "Personality Disorder" at Axis II and his prognosis was "Moderate." (Tr. at 101-02.)

3.     **Administrative Hearing**

At the administrative hearing on October 23, 2007, Plaintiff testified that his back and knee injuries began in 1997 after he "had steel fall on" him. (Tr. at 493.) Since Plaintiff indicated that he worked after the accident in 1997, he was asked, "What has changed over the last couple of years that, about your back or your knees, that's made it so you can't work because of those now?" (Tr. at 493.) Plaintiff responded, "I can't tolerate the pain." (Tr. at 494.) When asked if the various pain medications Plaintiff takes help with the pain, Plaintiff responded, "No." (Tr. at 495.) Plaintiff testified that he can only sit for 10 to 20 minutes before having to move around due to back pain and that he can only stand for 5 minutes before having to move around or sit down. (Tr. at 497.)

Plaintiff further testified that he can only walk "half a block" or he will "paralyze [him]self," meaning that he will "lose feelings in [his] legs." (*Id.*) Plaintiff walks with a cane that was prescribed by Dr. Crawford to help "[s]tabilize [his] balance from weaving back and forth." (Tr. at 497-98.) Plaintiff stated that he always uses the cane. (Tr. at 498.) Plaintiff stated, "I don't sleep" and when asked to clarify, he responded, "I either stay up all night or just sit in my chair and probably pass out for an hour, 15 minutes maybe, and I'm up for another eight hours" for a total number of hours in a 24-hour period of "[s]ometimes less than an hour, sometimes no more than three." (Tr. at 499.) Plaintiff testified that he does not do any household chores but that he has a driver's license and drives "[o]ccasionally." (Tr. at 500.)

When the ALJ asked Plaintiff when the pain that prevented him from working started, Plaintiff responded, "about 1997 when I had the steel fall on me. And I worked after that, I tried to hold jobs and I just couldn't." (Tr. at 501-02.) The ALJ referred to Plaintiff's income tax records showing that Plaintiff had not been gainfully employed from 1984 through 1997 and asked why Plaintiff was unable to work during those years, to which Plaintiff responded, "Can't hold a job

because of my mental state. I just, I don't know." (Tr. at 502.) IRS records revealed that Plaintiff

earned $304.85 in 1984, $583.77 in 1985, $3,073.66 in 1986, $4,246.73 in 1987, $130.93 in 1988,

$776.43 in 1989, had no income in 1990 or 1991, earned $1,430.71 in 1992, $2,733.19 in 1993,

and $1,939 in 1996. (Tr. at 502.) In 1998, Plaintiff earned $3,661.60. (Tr. at 503.)

The ALJ asked the vocational expert (VE) to assume a person with Plaintiff's background

who:

> During a normal eight-hour work period, assuming normal breaks and meal periods
> during the work period, the hypothetical individual has the following functional
> capabilities and functional limitations, as to lifting, able to lift and/or carry weight
> occasionally. Occasionally defined as up to one-third of the workday – up to five
> pounds of weight. And frequently, five pounds of weight. As to the capability of
> standing and/or walking, able to engage in standing and/or walking in the work
> place, assuming normal periods of breaks for a total of up to two hours during a
> normal eight-hour work period. As in a sitting position, assuming normal breaks in
> any work setting, during any normal eight-hour period the hypothetical worker has
> the functional ability to engage in the sitting position for periods of time upwards of
> six hours when performing work activity. Now sedentary jobs do not require
> workers to engage in crawling?

(Tr. at 515.) The VE responded that sedentary jobs do not require crawling. (Tr. at 516.) The ALJ

went on to add the following assumptions:

> Eliminate jobs that would require the hypothetical worker to engage in bending from
> the waist or knees. Eliminate from consideration jobs that would have extremes of
> cold or heat, as well as extremes of wetness and/or humidity. The hypothetical
> worker does have the functional capacity to communicate in the English language.
> Has the basic mental ability to understand, carry out and remember simple unskilled
> work instructions. The hypothetical worker has the mental functional ability to
> respond appropriately to usual work situations, unskilled, with coworkers when
> performing unskilled work activity. And the worker has the mental functional
> abilities in dealing with changes in a routine, unskilled work setting. As to the issue
> of hazards in the workplace, eliminate from consideration jobs that have hazards in
> the work setting from unprotected areas in moving machinery, heights, ramps,
> ladders, scaffolding, and on the ground level unprotected reaches of poles and pits.

(Tr. at 516.) The VE responded that such a person could perform the 1,000 information clerk jobs,

1,500 surveillance system monitor jobs, the 3,000 bench assembler jobs, and the 1,500 plastic

sorter jobs available in Southeastern Michigan. (Tr. at 516-17.) The VE also testified that the information she provided was consistent with the Dictionary of Occupational Titles (DOT). (Tr. at 517.) Plaintiff's counsel inquired whether a requirement that the person take unscheduled naps during the workday would preclude employment, the VE answered that it would. (Tr. at 518.) In addition, counsel asked if work would be precluded if the person is unable to appropriately respond to supervision because of the effects of depression, and the VE responded that such a person would not be able to perform the jobs listed. (Tr. at 520.)

### E.     ALJ Findings

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff had not engaged in substantial gainful activity since April 10, 2005, the alleged onset date. (Tr. at 24.) At step two, the ALJ found that Plaintiff's degenerative arthritis of the bilateral knees with history of torn anterior cruciate ligament, subsequent reconstructive surgery on October 6, 2005, total right knee arthroplasty on September 5, 2007, mild degenerative joint disease of the cervial spine at C4-C5, degenerative changes of the lumbar spine with disc space narrowing at L4-L5 and L5-S1, situational depression, personality disorder, history of substance abuse, and chronic headaches were "severe" within the meaning of the second sequential step. (Tr. at 24.) At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations. (Tr. at 25.) At step four, the ALJ found that Plaintiff could not perform his previous work as a laborer. (Tr. at 30.) At step five, the ALJ concluded that Plaintiff retained the residual functional capacity to perform a limited range of sedentary work. (Tr. at 26-30.) Therefore, the ALJ found that Plaintiff was not disabled. (Tr. at 34.)

### F.     Analysis and Conclusions

### 1.      Legal Standards

The ALJ determined that Plaintiff retained the residual functional capacity to return to a limited range of sedentary work. (Tr. at 26-30.) Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting and carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one that involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a)(1991). Social Security Ruling 83-10 clarifies this definition:

> "Occasionally" means occurring from very little up to one-third of the time. Since being on one's feet is required "occasionally" at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday. Work processes in specific jobs will dictate how often and how long a person will need to be on his or her feet to obtain or return small articles.

SSR 83-10.

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

### 2.      Substantial Evidence

Plaintiff argues that substantial evidence fails to support the findings of the Commissioner. As noted earlier, if the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. *McClanahan,* 474 F.3d at 833; *Mullen,* 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Specifically, Plaintiff contends that the ALJ failed to adequately account for all of Plaintiff's limitations in the RFC and in Step Five because the hypothetical's limitation to simple, unskilled work did not account for Plaintiff's limitations in concentration, persistence and pace (Doc. 14 at 15-18, 22-24), that the ALJ wrongly ignored Plaintiff's GAF scores (Doc. 14 at 17-18), that the ALJ's physical RFC finding was improper because it was based on his own lay opinion rather than the opinions of the medical doctors (Doc. 14 at 18-20), that although the VE indicated her testimony was consistent with the DOT, it was not (Doc. 14 at 23), and that the ALJ made an erroneous credibility determination that Plaintiff was not fully credible. (Doc. 14 at 20-22.) Plaintiff also moves to remand under sentence six based upon new evidence presented to the Appeals Council. (Doc. 15.)

### a.    Concentration, Persistence, and Pace

Plaintiff contends that the hypothetical's limitation to simple, unskilled work did not account for Plaintiff's limitations in concentration, persistence and pace. (Doc. 14 at 15-18, 22-24.)

Plaintiff's RFC Assessment concluded that Plaintiff was not significantly limited in understanding, memory, or sustained concentration and persistence. (Tr. at 138-39.) The assessment did find that Plaintiff was  moderately limited in his ability to interact appropriately with the general public and the ability to accept instructions and respond appropriately to criticism from supervisors but was otherwise not significantly limited in the social interaction and adaptation areas. (Tr. at 139.) The assessment concluded that, "[d]espite these limitations, he is able to perform unskilled work." (Tr. at 140.) Therefore, I suggest that the hypothetical embraced all of the findings in the RFC Assessment and that it limited the range of jobs to those requiring only the ability to understand, carry out and remember simple unskilled work instructions. (Tr. at 516.)

The Psychiatric Review Technique did find that Plaintiff is moderately limited in concentration, persistence and pace (Tr. at 134); however, I suggest that the ALJ's hypothetical is nonetheless supported by substantial evidence. *See Infantado v. Astrue*, 263 Fed. App'x 469, 477 (6th Cir. 2008) (substantial evidence supported ALJ's decision where, although the psychiatrist found "moderate" limitations in the plaintiff's ability to maintain attention and concentration for extended periods, the psychiatrist noted the plaintiff's daily activities and concluded that the plaintiff was capable of performing simple tasks on a sustained basis).

### b.    GAF Scores

Plaintiff also contends that the ALJ wrongly ignored Plaintiff's GAF scores, which were in the range of 50-54. (Doc. 14 at 17-18.) Plaintiff, however, is placing greater reliance upon the GAF scores than either the Commissioner or the Sixth Circuit has deemed appropriate.

> [T]he Commissioner "has declined to endorse the [GAF] score for 'use in the Social Security and SSI disability programs,' and has indicated that [GAF] scores have no 'direct correlation to the severity requirements of the mental disorders listings.'" The GAF scores, therefore, are not raw medical data and do not necessarily indicate improved symptoms or mental functioning.

*Kennedy v. Astrue*, 247 Fed. App'x 761, 766 (6th Cir. 2007) (citations omitted) (finding that increase in GAF score from 55 to 60 was insignificant). Therefore, I suggest that the ALJ's decision not to rely on the GAF scores is of little consequence and does not undermine the ALJ's substantial evidence finding. *See also Oliver v. Comm'r of Soc. Sec.*, No. 09-2543, 2011 WL 924688, at *4 (6th Cir. Mar. 17, 2011) (upholding ALJ's decision not to rely on GAF score of 48 because it was inconsistent with other substantial evidence in the record and noting that the "GAF score is not particularly helpful by itself"); *Turcus v. Soc. Sec. Admin.*, 110 Fed. App'x 630, 632 (6th Cir. 2004) (upholding ALJ's reliance on doctor's opinion that plaintiff could perform simple and routine work despite GAF score of 35).

19

c.      ALJ's "Lay Opinion"

Plaintiff contends that the "ALJ erroneously played doctor" instead of giving proper deference to the treating physicians. (Doc. 14 at 18-20.) In weighing the opinions and medical evidence, the ALJ must consider relevant factors such as the length, nature and extent of the treating relationship, the frequency of examination, the medical specialty of the treating physician, the opinion's evidentiary support, and its consistency with the record as a whole. 20 C.F.R. § 404.1527(d)(2)-(6). Therefore, a medical opinion of an examining source is entitled to more weight than a non-examining source and a treating physician's opinion is entitled to more weight than a consultative physician who only examined the claimant one time. 20 C.F.R. § 404.1527(d)(1)-(2). *See also Rogers*, 486 F.3d at 242 (stating that the "treating physician rule," which provides that "greater deference is usually given to the opinions of treating physicians than to those of non-treating physicians," is a key governing standard in social security cases).

"Claimants are entitled to receive good reasons for the weight accorded their treating sources independent of their substantive right to receive disability benefits." *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight." S.S.R. 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. "[A] failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

20

The opinion of a treating physician should be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(d)(2). A physician qualifies as a treating source if the claimant sees the physician "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition." 20 C.F.R. § 404.1502. "The opinion of a non-examining physician, on the other hand, 'is entitled to little weight if it is contrary to the opinion of the claimant's treating physician.'" *Adams v. Massanari*, 55 Fed App'x 279, 284 (6th Cir. 2003) (quoting *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987)).

In the instant case, there are no opinions from physicians regarding Plaintiff's mental health issues and the opinions of Plaintiff's treating physicians regarding his physical impairments do not conflict with the findings made by the ALJ. Dr. Crawford performed the arthroplasty surgeries on Plaintiff's left knee (Tr. at 146-50, 184-85) and, after surgery, found "no joint effusion, no redness or warmth," stated that Plaintiff "does have a benign appearing wound," and "started [Plaintiff] on physical therapy." (Tr. at 144.) Dr. Crawford also evaluated Plaintiff's right knee, found "significant arthritis," and "discussed at length with [Plaintiff] the idea of limited longevity of these knee replacements as well as the risks involved and the pain involved," but noted that Plaintiff was "still anxious to proceed," so he began "arranging right total knee arthroplasty for him." (Tr. at 187.) Dr. Crawford performed a right knee total arthroplasty on Plaintiff on September 5, 2007, after which an x-ray of Plaintiff's right knee showed the "[t]otal right knee arthroplasty with prosthesis appears in good position." (Tr. at 189-97, 205.)

Although Dr. Vijayakumar noted that Plaintiff complained of "a constant headache" that "sometimes . . . comes and goes," she reviewed the MRI of his brain, found that there was not a "significant problem," and thus prescribed Depakote to help Plaintiff sleep. (Tr. at 168.) On August 15, 2007, Dr. Vijayakumar noted that Plaintiff was "asking for stronger medication other than Vicodin," but Dr. Vijayakumar "advised him that I am not going to give any pain medications." (Tr. at 167.) Dr. Pierce also noted that "I do not have comfort in prescribing narcotics or aggressive treatment until the patient seems more committed to the program." (Tr. at 199.) I suggest that there are no treating physician opinions that are inconsistent with the ALJ's findings; thus, I further suggest that the treating physician rule has not been violated.

### d.      Credibility Determination

Social Security Regulations prescribe a two-step process for evaluating subjective complaints of pain. The plaintiff must establish an underlying medical condition and (1) there must be objective medical evidence to confirm the severity of the alleged pain rising from the condition or (2) the objectively-determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain. 20 C.F.R. § 404.1529(b); *Jones v. Sec'y of Health & Human Servs.*, 945 F.2d 1365, 1369 (6th Cir. 1991) (citing *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986)). If a plaintiff establishes such an impairment, the ALJ then evaluates the intensity and persistence of the plaintiff's symptoms.  20 C.F.R. § 404.1529(c); *Jones*, 945 F.2d at 1369-70. In evaluating the intensity and persistence of subjective symptoms, the ALJ considers objective medical evidence and other information, such as what may precipitate or aggravate the plaintiff's symptoms, what medications, treatments, or other methods plaintiff uses to alleviate his symptoms, and how the symptoms may affect the plaintiff's pattern of daily living. *Id.*

The issue is whether the ALJ's credibility determinations are supported by substantial evidence. An ALJ's findings based on the credibility of an applicant are to be accorded great weight and deference, particularly since the ALJ is charged with the duty of observing a witness's demeanor and credibility. *Walters*, 127 F.3d at 531. When weighing credibility, an ALJ may give less weight to the testimony of interested witnesses. *Cummins v. Schweiker*, 670 F.2d 81, 84 (7th Cir. 1982) ("a trier of fact is not required to ignore incentives in resolving issues of credibility"); *Krupa v. Comm'r of Soc. Sec.*, No. 98-3070, 1999 WL 98645 at *3 (6th Cir. Feb. 11, 1999) (unpublished).

After examining the record evidence, I suggest that substantial evidence supports the ALJ's findings, including the finding that Plaintiff's testimony regarding his level of pain was not fully credible. Plaintiff's physicians expressed some doubt as to his credibility when they refused to prescribe more narcotics. (Tr. at 167, 199.) The examiners found Plaintiff less than fully credible also. One evaluator stated that Plaintiff "appeared to be trying to exaggerate his symptoms." (Tr. at 100.) Another examiner also stated that he "tends to exaggerate his symptomology." (Tr. at 77.) The evaluator also noticed that Plaintiff was wearing cowboy boots, which is "an unusual choice of footwear for someone with disabling back pain," and thus concluded that Plaintiff "knows exactly what he is doing and he is certainly trying to manipulate the contents of this evaluation to his own benefit." (Tr. at 78.) Plaintiff's knees have been replaced and are in good condition. Although there is medical evidence of degenerative change sin the spine, the evaluator found that "[w]hen he stands, on observation of the dorsolumbar spine, there is no kyphosis or scoliosis," "no spasm," and "[t]here is a full range of motion of the cervical spine with no spasm," as well as a full range of motion of the shoulders, elbows, wrists and hands. (Tr. at 105.) I therefore suggest that

substantial evidence supports the ALJ's conclusion that Plaintiff's subjective complaints of disabling pain were not fully credible.

### e.    VE's Testimony Consistent With DOT

Plaintiff also contends that the ALJ failed to satisfy Step Five because although the ALJ inquired whether the VE's testimony was consistent with the Dictionary of Occupational Titles ("DOT") and the VE responded that it was consistent, Plaintiff argues that "the VE did not provide DOT numbers and the DOT reveals there are conflicts between her testimony and the DOT, contrary to her assertion that her testimony was consistent with the DOT." (Doc. 14 at 23.) In this Circuit, Social Security Ruling 00-4p is satisfied, however, by the ALJ simply asking the VE if her testimony is consistent with the DOT. *See Martin v. Comm'r of Social Security*, 170 Fed. App'x 369, 375-76 (6th Cir. 2006). Therefore, I suggest that the ALJ was not under any obligation to inquire any further into the accuracy of the VE's testimony. *See Ledford v. Astrue*, 311 Fed. App'x 746, 757 (6th Cir. 2008) ("Nothing in the applicable Social Security regulations requires an administrative law judge to conduct his or her own investigation into the testimony of a vocational expert to determine its accuracy, especially when the claimant fails to bring any conflict to the attention of the administrative law judge").

### f.    Sentence Six Remand

As mentioned, Plaintiff seeks a sentence six remand to enable the Commissioner to consider new evidence. (Doc. 15.) The Supreme Court only recognizes two kinds of remands involving social security cases: those pursuant to sentence four and those pursuant to sentence six of 42 U.S.C. § 405(g). *Melkonyan v. Sullivan*, 501 U.S. 89, 99, 111 S. Ct. 2157, 115 L. Ed. 2d 78 (1991); *Sullivan v. Finkelstein*, 496 U.S. 617, 626, 110 S. Ct. 2658, 110 L. Ed. 2d 563 (1990). The Supreme Court concluded that Congress's explicit delineation in § 405(g) regarding circumstances

under which remands are authorized clearly showed that Congress intended to limit the district court's authority to enter remand orders in these two types of cases. *Melkonyan*, 501 U.S. at 100. Sentence four allows a district court to remand in conjunction with a judgment affirming, modifying or reversing the Commissioner's decision. *Id.* at 99-100. Sentence six allows the district court to remand in light of additional evidence without making any substantive ruling as to the merits of the Commissioner's decision, but only if a claimant can show good cause for failing to present the evidence earlier. *Id.* at 100.

The Sixth Circuit has long recognized that a court may only remand disability benefits cases when a claimant carries his burden to show that "the evidence is 'new' and 'material' and 'good cause' is shown for the failure to present the evidence to the ALJ." *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 276 (6th Cir. 2010). Evidence is only "new" if it was "not in existence or available to the claimant at the time of the administrative proceeding." *Id.* (citing *Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001)). In addition, "such evidence is 'material' only if there is a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence." *Foster*, 279 F.3d at 357.

"'Good cause' is shown for a sentence six remand only 'if the new evidence arises from continued medical treatment of the condition, and was not generated merely for the purpose of attempting to prove disability.'" *Payne v. Comm'r of Soc. Sec.*, No. 1:09-cv-1159, 2011 WL 811422, at *12 (W.D. Mich. Feb. 11, 2010) (finding evidence generated after the hearing and submitted to the Appeals Council for the purpose of attempting to prove disability was not "new").

In the instant case, Plaintiff would like to remand for consideration of the evidence presented only to the Appeals Council, and not to the ALJ. (Doc. 15 at 2-4; Tr. at 239-486.) Plaintiff summarizes the evidence brought before the Appeals Council (Doc. 15 at 2-3): (1)

psychiatric admission notes from September of 1981 through January of 1982 (Tr. at 260-63); (2) psychiatric notes from Insight Recovery Center and records from the Behavioral Center of Michigan due to suicidal ideation and GAF scores; (3) treatment, physical therapy at Oakwood Hospital from September 2007 through September 2009 for back and knee pain (Tr. at 370-428); (4) left knee arthroplasty on May 5, 2008, and revision of right knee arthroplasty on September 29, 2008 (Tr. at 370-90); (5) suicidal ideation requiring hospitalization on June 3, 2008 (Tr. at 401-07); (6) continuing treatment for knee pain from October 2007 through October 2009 (Tr. at 268-72); (7) continued treatment for back pain (Tr. at 248-59, 277, 281), including steroid injections after diagnosis of cervical spondylosis and radiculitis (Tr. at 275, 285-87); and (8) an MRI showing mild to moderate narrowing at L4-S1. (Tr. at 242.)

I suggest that the psychiatric notes from September 1981 through January 1982 are not new and Plaintiff has not shown good cause for the failure to bring them before the ALJ. I further suggest that the remaining evidence is not material. Evidence of Plaintiff's suicidal ideation was presented to the ALJ, Plaintiff's left knee surgery would have resulted in a functional left knee just as the right knee surgery revision would do and evidence of the original right knee surgery was before the ALJ. Continuing treatment for back pain is consistent with evidence before the ALJ and would not add to the ALJ's findings. I therefore suggest that a sentence six remand is not necessary where, as here, the Secretary would not have reached a different disposition of the disability claim if presented with the new evidence.

## III.   REVIEW

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1).

Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan*, 474 F.3d at 837; *Frontier Ins. Co.,* 454 F.3d at 596-97. Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be concise, but commensurate in detail with the objections, and shall address specifically, and in the same order raised, each issue contained within the objections.

                                        s/ 𝕮𝖍𝖆𝖗𝖑𝖊𝖘 𝕰 𝕭𝖎𝖓𝖉𝖊𝖗
                                        CHARLES E. BINDER
Dated: April 28, 2011                   United States Magistrate Judge

---

**CERTIFICATION**

I hereby certify that this Report and Recommendation was electronically filed this date and served upon counsel of record via the Court's ECF System.

Date:  April 28, 2011                   By      s/Patricia T. Morris
                                           Law Clerk to Magistrate Judge Binder